Judge Ceenshaiv
delivered the opinion of the Court.
John Todd emigrated to Kentucky at an early day, whilst it was one of the Counties of Virginia, and obtained inchoate titles to a considerable quantity -of laud, much of which lies in and about the city of Lexington. In 1782, a battle was fought between the Kentuckians and jndians, at the Blue Licks, in which John Todd was slain.
He left, at his death, a Widow who was encient, and a daughter, Mary Owen, his only child. His widow was subsequently delivered of the child of which she was encient; but whether the child was born dead or alive is not'satisfactorily shown; the probability is,it *290 was still born, and, an abortion consequent upon the sad news to the mother of her husbands death in battle. We do not deem it important, however, whether it was born quick or still.
Mary Owen Todd, being quite a child at the death of her father, her uncle Levi Todd, was appointed her guardian; and grants for the lands aforesaid were issued to her as heir at law to said John Todd. She grew up, and intermarried with James Russell, by whom she had one child, John Todd Russell, who died at the age of abouttwenty two years. James Russell, also died, and his widow, the said Mary Owen, subsequently married the defendant Robert Wickliffe. And by an arrangement between him and his wife, all her lands, not in the adverse possession of others, were conveyed by them to Richard Chinn, and William Owsley, who reconveyed to said Wickliffe.
In 1844, Mary Owen Wickliffe departed this life, and, in 1849, this suit was instituted by the children and grand-children of Robert, and Levi Todd, in which they charge not only that John Todd, before he went to the battle of the Blue Licks, made a will, but that, by his will, the children of Robert, and Levi Todd, were made contingent devisees; that the said John Todd “devised all the lands to which he had claim, to his said child, Mary Owen, if she had child or childi-en to inherit from her that is, if, at her death, she had no offspring living, nor descendant from her, the lands mentioned in said will were, by the testator, devised to the children of his two brothers, the said Robert and Levi Todd ;” that diligent search had been made for copies of the will, and none had been found, that those who had seen authenticated copies of the will were clear in their recollection, that Mary Owen, was to have a life estate only in the lands, and if she had child or children, and their descendants, who should survive her, they were to pass to them, but if, at her death, no such child or descendent were in existence, then the said lands were to pass to the children of Robert and Levi Todd.
Tlie answer oi the delendant.
The points of inquiry in :h® case.
In an amended bill it is alleged, that John Todd, “published his will devising a portion of his estate to his surviving widow for life, and the whole of it, to Ms cMld mr cMldren, and if they should die without a living child to inherit it, then to the testatoi-s’ two brothers, Robert and Levi, his companions in peril, or to their cMldren. The appellants pray that defendant, Wick-liffe, be compelled to convey the title of the lands to them, to surrender the possession, and for general relief.
Wickliffe in his answer, without positively denying that John Todd, made a will- at all, but putting the appellants upon the proof of it, denies that he madesuck a will as .the one charged to have been made, and states that, if he made a will at all, it was made before he had any children ; that “he cannot say what will he did or did not make, but that it has been his fix-m conviction, that he never made such as charged, or any will whatever1, in "which either the children of Robert or Levi Todd, or any of them-, were mentioned, much less can he believe that he devised a life estate to his daughter, remainder in fee to Levi Todd’s children, or Robert Todd’s children.”
The difficulty as to whether a will was, or was not, made, and, if made, what were its contents, arises from the fact, that, in 1803, the clerks office of the Fayette County Court, where the will is alleged to have been recorded, was consumed by fire, with its records and papers on file.
The allegations of the bills are somewhat vague and indifinite, and are evidently made upon information de-ved from a source not clear and definite in recollection; but we will not enter upon a critical examination of these allegations, for, after so long a time as has transpired since the supposed publication, and even since a supposed copy was seen, any great accuracy, or certainty of recollection in regard to the language of the- testators, could not be expeoted. We take the allegations to be substantially these: that John Todd, before he *292 went to the battle at the Blue Licks, made and pub-irshed his last will and testament, by which, after making some provision for his- wife during her life, he devised the whole of his lands to his child or children, and, if they should die without childreu living at their death, then to- his two brothers, Robert and Levi, or, to their children.
That a will was made and published by John Todd, in his lifetime, and recorded in the clerks office of the Fayette County Court, no ratioual man can doubt. The fact is established by several witnesses of unimpeachable character, who had every opportunity of knowing — one of them was a member of the Court when the will was produced for record---one was a deputy clerk in the office, who remembers frequently to have read it, and to have copied it more than once. And yet, when all the circumstances exhibited by the record are considered, it. seems to be very remarkable that, if, in fact, John Todd, did' make a will, no copy has been preserved. By the record of May's heirs vs Mary O. Russell, &c., filed in this suit, it appears that, as far back as 1788, long before the clerks office was consumed by firer and whilst the will must have been accessible, being spread upon the records of that office, or atanj- rate, on file, John May instituted a suit in which this very will was set up, which it was material to produce; that several copies had been procured before fbe office was burnt; that those who were interested in its preservation lived in Lexington, or its neighborhood; that, an act of the Legislature was passed after the burning, allowing copies to be recorded ; and yet, no copy can be found. But remarkable as it is, we can deduce no other conclusion from the facts proved, than that a will was made and recorded.
Pretermitting, for the present, other questions of minor importance, we will enquire what were the contents of this will? Has such testimony been adduced as satisfies the mind that the provisions of John Todd’s will were those contended for by the appellants ?
~The testimony of the witnesses-examined.
Mrs Neely testf^ mony in respect to the will.
There are three witnesses upon whom the appellants mainly rely — Mrs. Judd, Mrs. Vanoe, and Mrs. Neely. And, were it a matter of any consequence, we would, in considering their statements, reject the declarations of Mrs. Irvine, not made in the presence of Mary Owen Todd, as incompetent, but it is deemed of but little moment whether her declarations are excluded or not. Mrs. Judd, in answer to the question, whether she ever heard Polly Todd, or her mother in her presence, talk about any will made by her father, John Todd, states-. “They all told me that he made a will before he went to the battle, and that it was his will that, if Polly died without an heir, the property was to go to the Todd’s, I don’t know whether they meant that it was a written; will, or was his will just so. I heard from Mrs. Irvine, that, when Col. Todd, left for the battle, she was pregnant, but neither he nor she knew it, and the child dying, it all went to Polly.” And, in answer to the question, “when she heard Polly say that her father made such will,” she says: “It was at her mother’s (Mrs. Irvine,) before she was married; she said if she were married, and had no children, it was to go to the Todd’s her uncles, and their children.” She states that, at this time, Polly was fifteen or sixteen years of age.
Mrs. Neely, testifies that, when her son-in-law, January, was removing some papers from an old desk which had belonged to Col. Irvine, in his lifetime, he came to her with a bond printed on parchment, and in the parchment bond was folded a paper, endorsed, “a copy of Col. Todd’s will.” She is asked “whether this copy contained any provision as to the manner in which the property should go, whether to his, Col. Todd’s children, and, if they should die without leaving any children to inherit from them, it should go to the children of his brothers, Robert and Levi, and if otherwise; how?” She answers: “Col. Todd, directed in the will that, if he had no living children, it should go to the children of Robert and Levi Todd.” She is then asked to state, “whether the provision in the will was or not *294 that, if his, Col. Todd’s children had no children living at their death, the property should go to the children of his brothers, Robert and Levi.” To this she responds: •‘I do not know whether or not ; I did not notice the praseology of the will particularly — I only noticed that part, as it astonished me very much, it being a thing I had never heard.” Again she is interrogated thus: ,‘Can you say that the praseology of the will was that, if Col. Todd, had no living children, his property should go to the children of Robert and Levi Todd, or, that it was that, if his Col. Todd’s children had no chil.dren to live to inherit from them, that then the proper«;ty should go to the children of his brothers, Robert and She responds: “My clear understanding of the was that, if he had no living children, nor heir of flhis own, the property was to go to the children of his Robert and Levi. I do not know or recollect whether the will said any thing about their being living or dead ; upon seeing a copy of the will, and never having before heard that there was a will, and knowing that the widow had taken her thirds of the estate, a very strong impression was made upon my mind, and it served as an explanation to many difficulties in the family which I had never before understood. One of the reasons was, L'evi Todd’s great watchfulness over the property after Mrs. Russell was a married woman, the feelings of the family were often hurt with him about it.” Again she is asked: “Is it your recollection of the will or not, that if Col. John Todd’s child or children, should die without leaving any child or children, his property should go to the children of his brothers, Robert and Levi.” She answers: “I do not know whether he said living or dying, but my understanding was that, if he had no descendants of his own, his property was to go to the children of Robert and Levi — I know that he had a living child when he died, and expected another which I understood from the family was born after his death.” She states, that there were only two sentences in the will; one in re *295 gard to a deed to be made to Paddy Owens, and the other in regard to the disposition of his property; that there were only two names mentioned in the will, those of his brothers, Robert and Levi, and that their names were only mentioned as executors, and in connection with the devise to their children. It is deposed further by her, that it is her best impression the copy which she saw was an attested copy; the body was in an unknown hand, and the endorsement was in the handwriting of Col. Irvine. '
Jos. H. January's to as to time.
Mrs. Vance’s testimony as t same.
Testimony of witnesses compared and scrutinized, to ascertain the provisions of the will oí John Todd.
Her son-in-law, Joseph H. January, deposes that, in removing the papers from the desk of which she speaks, he found a bundle of papers containing a deed' from Paddy Owens, and wife, to Col. Irvine, of fifty acres of land, and he is under the impression that, in the same bundle of papers, there was a copy of a will made by John Todd, which appeared to be duly recorded, and was signed by some Todd as clerk — he thinks Levi Todd, — but of this is not certain — it was on a sheet of cap paper, and was written nearly all over— recollects not much about the contents of the will except a clause of a “bequest” of fifty acres of land to Paddy Owens. He says these papers'were found in 1825, or, 1826.
Mrs. Vance, testifies, that she has heard Mrs. Russell, afterwards Mrs. Wickliffe, say, if she should die and leave no children, and her son, John, should die and leave no children, the property should go to Robert Todd and Levi Todd’s children. And, in answer to the question “ whether Mrs. Russell spoke of the will expressing the way the property should go, she said, yes, she spoke of the property going to her father’s brothers’, Robert and Levi Todd’s children.”
Upon the testimony of these witnesses we have to ascertain the contents of John Todd’s will, if they can be ascertained at all; and we have been at the pains to extract from their depositions all that we esteem pertinent and important, in order that we might more readily examine their testimony, and determine its true *296 force. If the witnesses taken separately do not satisfy the mind, yet, if they give aid, support, and corroboration to each other, they may enable us to arrive at a satisfactory conclusion ns to the contents of the will. Then, conceding full failh and credit to the witnesses, and combining their testimony, hut, taking into consideration the lapse of time which intervened from the time their knowledge, was acquired, to the time their depositions were taken ; their intelligence, and the nature and character of their testimony, are we enabled to say satisfactorily, what were the provisions of this will.?
Mrs. Judd, and her daughter, Mrs. Vance, appear to be women of ordinary intelligence, but the subject was not one in which they would likely feel an interest.; they were not of kin to the parties ; no subsisting relationship between them, either of blood, affinity, or otherwise, to prompt them to give an attentive ear to what was said ; the time which has elapsed since they heard what they attempt to relate, has been long — not less than some thirty or forty years ; their testimony is of the declarations of a person in the presence of the witness only — under all circumstances, the weakest, and most unsatisfactory and most dangerous testimony held competent by law. This is the nature and character of two-thirds of the testimony, upon which we are to endeavor to ascertain the contents of John Todd’s will.
According to the first statement of Mrs. Judd, “the property was togo to the Todd*, if Polly died without an heir;” we might enquire, which of the Todds? John Todd had a father, mother, three brothers, and two sisters. Only two, however, resided in this State, Robert and Levi. The witness, doubtless, had in her mind Robert., and Levi Todd, as she may never have heard .of any other Todds; but the declaration which she mentions was not confined to Robert and Levi, but was sufficiently broad to embrace those without, as well as those W'ithin, the State. But the whole of what she says must be taken together, and she says further: *297 “ She, Polly, told me, if she never married, and had no children, it (the property,) was to go to the Todd’s, her uncles, and their children.” Whatever might be the difference in effect, of these two different forms of expression, when critically analyzed, we are of opinion that they mean the same thing in substance; and that is, if Polly should die without an heir, the property was to go the Todd’s and their children and that she means Robert and Levi Todd only, and their children.
Mrs.' Vance is somewhat vague and unsatisfactory. She heard Mrs. Wickliffe say, if she should die and leave no children, the property should go to Robert and Levi Todd’s children. In this declaration, no allusion is made to the will of John Todd. It appears to express simply the intention of Mrs. Wickliffe in regard to her estate. The counsel, conscious of this, asked .her “whether Mrs. Wickliffe spoke of the will expressing the way the property should go,” and she answers, “yes, she spoke of the property going to her father's brothers, Robert and Levi Todd's children. Now this, perhaps, is saying no more than she had said before. It might be asked whether her answer, by a fair construction amounts to more than this: that Mrs. Wick-liffe. spoke of the will, expressing the way the property should go, and she (Mrs. Wickliffe,) spoke of its going to the children of Robert and Levi Todd. But, if she intended to say, as^we are inclined to think she did, that Mrs. Wickliffe déclared that the will of her father directed that, in the event she should die and leave no children, the property should go to the childrén of Robert and Levi Todd ; it would be difficult to come to the conclusion that it would be proper to take a large estate out of one channel and place it in another, upon testimony based merely upon the confessions, or declarations of Mrs. Wickliffe, made thirty or forty years ago, in the presence of the witness only. It would not be an easy conclusion, conceding that her testimony is corroborated in-every particular by that of Mrs. Judd, *298 founded upon'like confessions, and detailed after the same lapse of time ?
A case in ivliich ¡lie i|. cisi'ii of the Co'in relenting a deposition Inken n »er-■ond lime by the same pa'ty mid lelnsing leave lo remlie. it was approved.
But we will turn to the testimony of Mrs. Neely, and ascertain whether, in it, any support is to be found to the testimony of Mrs. Judd, and of Mrs. Vance. And preparatory to an examination of her testimony, we will remark, that it is insisted the Circuit Court erred in overruling the motion of the appellants for leave to retake Mrs. Neely’s deposition. It was a matter of discretion in the Court, and that discretion, in our opinion, was not only not abused, but properly and rightfully exercised. Complaint is made that she “was severely scrutinized, and catechized, and, in a manner calculated to excite and confuse her; that round-about, obscure, and vexatious questions were put to her.” True, her examination was a long and tedious one, and no doubt embarrassing; but it must be remembered that she was first examined by the party at whose instance her deposition was taken, that her responses to their questions constitute the testimony desired to be explained; that not the slightest confusion is displayed in these responses, but considerable intelligence, -coolness, and self possession ; that the same question in a different form was put by the appellants not less than three or four several times, and the same answer is substantially given upon every interrogation; when too, from the leading character of the interrogatories, no witness of her intelligence, as it seems to us., could mistake the answer which was desired or fail to perceive the very point to -which an affirmative response was desired. Her mind was drawn directly and repeatedly, to the same question in a different form, which she pertinaciously answered three or four different times in the -same way, and which she answers .in another way when her second deposition is taken without leave of Court. Under .these circumstances, if it ware not discreet and proper to refuse leave to retake a deposition, we are at a loss .to know what state of case would authorize a refusal.
*299 The testimony of Mrs. Judd and Mrs. Yance, meets ■With no support from Mrs. Neely, except that, in some event, according to all three-, the Todd’s, or the children of Robert and Levi Todd, were to have the estate.
But, did Mrs. Neely, ever see a copy of the will? There is no doubt in our minds, that she did see what purported to be a copy. It was endorsed, “A copy of Col. Todd’s will.” In whose hand-writing? In that of Col. Irvine. In whose chirography was the body of the will? She does not know, but says ‘’it spoke of being an attested copy. Levi Todd was clerk, but she was not acquainted with his band-writing. She says,. “there were but two sentences in the will — one as regards a deed to Paddy Owens, and one as regards the disposition of the property ; that there were only two-names mentioned in the will- — his brothers, Robert and Levi — the names of Robert and Levi were only named as executors, and in connection with the devise to their children.” Joseph H, Januaiy, who saw the same paper, deposes, “ that it appeared to be duly recorded, and a copv from the old record, and was signed by some Todd as clerk, and, he thinks, Levi Todd, but is *101 certain; that it was written upon a sheet'of cap paper, and was written nearly all over.”
Now this may, or may not, have been a copy of John Todds’ will» The circumstance of its being found in the desk of Col. Irvine, who married the widow of John Todd, who was an executrix, is strongly in favor of its being a copy. And it was attested, and January says, the name of some Todd, and, he thinks, Levi Todd, was signed to it — this raises another presumption in its favor. But is the proof- sufficient to satisfy the mind that it was certainly a copy? It may have been a true, -or, an attempted copy of a copy. Neither Mrs. Neely, nor January, were acquainted witli the band-writing of Levi Todd — they cannot' say, therefore, that" it was a genuine copy from the original, or from the record. But, we are inclined to think, that the office having been burnt down in 1803, and an old *300 papei’having been found as this was, after considerable lapse of time, among the papers of the husband of the executrix, purporting to be a copy, it ought to be considered a genuine copy in the absence of any proof to the contrary.
Taking it for a genuine copy, it bears some evidence that Mrs. Neely, although a lady of intelligence and fine character, is, like all mankind, liable to err. She makes Robert and Levi Todd the executors, and,, we believe, it is not disputed but that Mrs. Irvine and Robert Todd, were the only, executor and executrix. If mistaken in regard to the executors of the will, may she not be equally mistaken in regard to its provisions in reference, to the property? But the fact of her having made one statement in her deposition which was •read upon the trial of this case, and another, in her deposition taken without leave of Court, essentially different from each other, is still a stronger evidence of her liability to mistake. It all shows the frailty of human memory, and how little reliance is to be placed upon our recolleotion of the language, or, even the substance of a written instrument after many years have gone by. Indeed, there is scarcely a competent lawyer who will venture to advise an applicant as to the meaning and effect of any devise in a will, upon his mere statement» although he may have come recently from its perusal. Before hazarding an opinion, he will despatch his client for the instrument, or for a copy. In this case, it seems, that Mrs. Neely and Mr. January cannot remember alike, even in regard to the appearance of the copy. She states that • “ there were only two sentences in it, and he, that it was written upon a sheet of cap paper, and written nearly all over.” But, Patterson, concurs with her, that the will was a short one.
In all that we have said thus far, we have conceded to Mrs. Judd and Mrs. Vance, good characters. But, from the proof in the cause, their characters are not good; and we think no great deal of credit is due to their testimony.
*301 John Todd, however, did leave a will. He was a man of energy, of talents, and of business habits. He came to the country at a dangerous time in our history; it was infested with savages, and perils were thick and imminent; no one knew when he was safe from the skulking, blood-thirsty savage; and it is reasonable to suppose, that such a man as John Todd would prepare and keep a will; and, it is equally reasonable to suppose that his brothers, or their children, in default of having children of his own, would be objects of his beneficence. WKen he made his will is not known; Mrs. Judd says that Polly and her mother told her he made a will before he went to the battle, but how long before, it is not said, in the suit of John Mays’ .heirs against Mary Ü. Russell and others, instituted in 18L4, it is alleged that it was made about the month of November, 1780; hut at what time it was in fact made does not appear in proof. We are inclined to believe that, he kept a will by him, and that it was made before he had any children. Upon this liypothesis.it is easy to see that the provisions of the will’ can be made to harmonize with the deposition of Mrs. Neely; and that is, “if he had no descendants of his own, the property was to go to the children of Robert and Levi Todd.” He did have a descendant of his own, and, thereupon, any expectancy for the children of Robert and Levi was at an end. In this way, the conduct of Robert and Levi Todd can be accounted for, and- in no other. It is utterly impossible to reconcile their conduct with the supposition of a contingent interest oil the part of theirchildren, in John Todd’s estate. Nor, can it be supposed, if there were still a subsisting contingent interest in the children of Robert and Levi Todd, that the Legislature of Virginia, with the will before them, (as we must presume it was,) would pass an act for ihe sale of about one-fourth of the land, requiring no consent from the contingent devisees, or their guardian, and making no provision for their contingent interest in the proceeds of the sale.
*302 Robert and Levi Todd resided in the town of Lexington ; Levi was the Clerk of the Fayette County Court, where the will was recorded ; he was guardian for Mary Owen Todd, procured a copy of the will before the office was burned down ; the Legislature passed an act admitting copies to be recorded; Mary Owen, when of age, made sales of quantities of the land; the Todds, themselves, became sub-venders of portions of it; Robert, in conjunction with the widow, apply to the Virginia Legislature for the absolute sale of one fourth of the lands; other copies of the will, hesidés the one for Levi> Were procured ; and no copy is preserved ; none is recorded; no complaint is made of the act of the Virginia Legislature; no objection is heard to the sales wade by Mary Owen; and still, it is insisted that the children of Robert and Levi Todd were interested in the lands. If so,-the conduct of these two parents was unnatural and unaccountable. And, all these facts considered, it would he hard to conclude that the children of Robert and Levi Todd were interested, though Mrs. Judd, Mrs, Vance, and Mrs. Neely, all, concurred in making them so. It would be equally rational to suppose they were mistaken. '
But it is insisted by the learned counsel for the appellants that, upon the supposition of an interest in the children of Robert and Levi Todd, there is nothing Strange, or unaccountable in the conduct of' the parents; that their children were only to have the property upon thedeath of Mary Owen, leaving no children; and, she having given, birth to John Todd Russell, and capable from appearances of having other issue, the contingency was rendered so remote, as to destroy their hopes for their children. This .state of case could not have been improbable in the mind of their uncle, and still, he did not think it useless to provide for the children of Robert and Levi, as the event of his daughter’s dying without issue might happen. And, any provision which the uncle thought it proper to make for the children, Was surely worth the attention of their fathers. They *303 «light at least have taken some steps after the clerk’s office and records were burned, to preserve some memorial of the will; if copies were not accessible, a suit might have been instituted to perpetuate the testimony, whilst there were living witnesses who had seen the will, and who could not well be mistaken as to its contents.
Though tha tes-tunony may show clearly íeíreti have eíTanTitcoiXi and burned, and the mis mü and reS m fact made be^too ll,no®r,ain ihortze the Court to say contents^6 and a®ya]]^} by ihe complain-anl. and xelte| denied,
Hewitt and Robertson for plain tills; Morehead, G.B, Kinkead, and Preston, for defendant.
To Mrs. Wickliffe are accorded, on all hands, an enviable reputation, and an exemplary lite ; she appears to have been endowed, in a high degreé, with all the virtues for which her sex are so justly distinguished; she was the onlv living descendant of a worthy anees-J tor, and she eminently reflected his virtues. It is not easy to believe that a woman of her character, knowing it to be the will of her father that, in default of her issue, the children of her uncles should have an estate which he had acqnir'd by the toils and hardships of a frontier life, amid perils the vnost threatening, would perpetuate the unfilial, ungrateful, and dishonest deed of frustrating that Will. ^
tyt i t i * ... ,, __ , We believe that the will of John Todd contained some provirion for the ben fit of Robert and Levi Todd, or their children, but what that provision was, is a matter of uncertainty — we are inclined to the opinion, as already remarked, that the provision was such as Mrs. Neely stated it to have been; and according to that, John Todd, not having died without a descendant the contingency, upon which the children of Robert and Levi Todd were lo take never happened. The testimony of Mrs. Neely, far outweighs, in our opinion, that of Mrs. Judd, and her daughters combined.
In any view which we have been able to take of the case, it was proper in the Circuit Court to dismiss the bill.
Wherefore the decree is affirmed.